Houston Casualty Asserts Two Causes of Error in the District Court's Rulings in this case. The primary basis for our belief is that the District Court erred in granting summary judgment, or partial summary judgment, in favor of Hot Stuff Foods and in denying Houston Casualty's motion for summary judgment. Our second argument is our contention that the District Court misread the expert reports that were submitted, and that Hot Stuff did not be expert in due to the coverage of the policy for the mislabeling incident at issue. Our second ground for belief is that the District Court erred in denying Houston Casualty's motion for judgment as a matter of law with respect to the claim of lost profits at the trial that took place subsequent to the summary judgment ruling. I would like to focus my argument right now on the summary judgment issues in this case. The insurance policy that was issued by Houston Casualty to Hot Stuff Foods extended coverage only to accidental product contaminations, as are defined in the policy. It clearly did not intend, it was not written to cover every recall incident or every mislabeling incident, but only incidents as defined as accidental product contamination within the terms of the policy. And that definition includes a requirement... Is there a reported case where a recall was denied, a recall claim, a claim based on a recall, USDA recall was denied coverage? Under this policy? Yes. Or, you know, this type of policy. Well, the Little Lady Foods... No, I want to talk to you about that, but that's not an example. Because there was no recall in that case. Well, I don't know if there has been, under this published case, under this policy. I know that Houston Casualty has. So you don't know of one, is the answer. I'm not aware of one. And did you cite Little Lady Foods to the district court? He didn't cite it to us until you replied to me. I don't recall if it was cited. It probably was cited in the summary judgment briefs, but I don't recall. The definition of accidental product contamination requires that there be... The contaminated product or the mislabeled product either has resulted in or may likely result in physical symptoms of bodily injury or illness with 120 days of consumption. Hot Stuff failed to meet its burden to prove that the amount of MSG present in the breakfast sandwiches that were recalled was sufficient to cause physical symptoms of bodily injury in any person, or certainly was not likely to. Now, there was no evidence presented whatsoever that anybody actually had an adverse reaction to any of these sausage breakfast sandwiches. And the evidence presented in the district court summary judgment established quite conclusively that there was no basis to conclude that anybody would have an adverse reaction. The first and clearest error of the district court was its reading of Dr. Saxon's expert report. This was really a crux of the district court's ruling, because the district court concluded that Dr. Saxon, who is the casualty's expert, actually agreed or conceded that there was a risk of someone having an adverse reaction to the MSG and the product at issue. And what the district court relied on was a statement he made where he acknowledged that there was a case report and a letter to the editor, so to speak, where two instances of anecdotal and unconfirmed reports of people reacting to MSG were reported. He acknowledged that because, as a scientific expert, he wanted to be thorough and state, I acknowledge that there's a case report. But then he immediately thereafter says, this is an unconfirmed report, it's not reliable, and it does not rise to the level of proof that there actually would be an adverse reaction. And his ultimate conclusion in the expert report was that the MSG would not likely result in an adverse reaction to anybody, and that this amount of MSG was harmless for the entire population. And the district court said that interpretation of likely she rejected. She didn't disagree that that was his conclusion. She said the legal test is possible, not likely, and therefore his couple of anecdotal reports means even if it's two persons, that's enough. No. Wasn't that the whole thing? No. I mean, that's the thrust of your brief. You're changing the issue, actually. No, no. There's two issues. One is whether Dr. Saxon admitted that there was even a possibility of an adverse reaction. The second was whether or not the threshold was a likely standard or not. The district court clearly misread Dr. Saxon's report when he acknowledged a case report to basically equate that to a concession on his part. What Dr. Saxon said was there's a case report, but that's not evidence that the person in that case report actually reacted to MSG. That's not sufficient evidence. And when you look at the entire body of scientific literature, including the FDA report cited by both experts, there's no scientific evidence that anybody consuming less than five grams of MSG with food will have a reaction to MSG. There is just no evidence of it. And this court itself in the Glasser case, the 2001 decision, recognized that case reports such as the one that Dr. Saxon mentioned are not scientifically valid proof of causation. They're simply anecdotes, letters to the editor, untested statements. So, in short, Dr. Saxon did not— This wasn't a torts case. This was a coverage case. We don't need a battle of experts. If you need a battle of experts to decide a coverage question, under South Dakota law, the insured wins. Well, it's not for the purpose of a battle of experts. It's for the purpose of clarifying what Dr. Saxon said. But that just gets you to his battle with Dr. Fishman. Well, at best— You're setting up a battle of experts. At best, it's a battle of experts. And therefore, summary judgment is inappropriate. At best for you. No, I would say at best for Hofstadt. There was a battle of experts in the district court who could not have granted summary judgment because the experts—Dr. Saxon clearly did not say or support the proposition. What you're saying is that the district court relied on a summary judgment of an undisputed fact with an admission by your expert, which you say was not an admission. Correct. Therefore, it was not an undisputed fact. It was a disputed fact. Well, correct. I mean— As far as that goes— I know you think your expert's right. Right. But, Dr., you're saying that they never admitted it, so it's disputed. Correct. He never admitted it, and if you read the report, just the mere fact that he references that there's some minimal evidence, he then says that is insufficient evidence to show causally. Well, let's get to interpreting the language, and particularly under the umbrella that the insurance company apparently sees it's their language. If there's any ambiguity, it's going to be interpreted against your company. So why isn't the district judge's interpretation reasonable? Well, of course, this court has to know the review of the interpretation of the policy of the court's ruling on summary judgment. I don't think it's a reasonable interpretation to say the words may likely result in—that the words may and likely cancel each other out. The district court essentially read the word likely out of the policy. I don't think that may likely result when applying the appropriate standard, which is to apply a reasonable, ordinary interpretations, common sense interpretation, and not to read a policy to remove or ignore parts of the policy. If you interpret it in that context, to say may likely result is ambiguous, and that really could mean any theoretical possibility, I think that's an unreasonable reading of the term may likely result. I'm not familiar with this coverage. Is this an ISO form that you're clarifying? It's a specialty form. It's not a general liability policy. It's an accidental product contamination policy that's specially written just for these— By Houston Cash. By Houston Cash, correct. You know, just stepping back and looking at this language, if I were to say to you it may likely snow tomorrow, there's a theoretical chance it may snow tomorrow, but clearly a listener hearing me say it may likely snow tomorrow would assume that I'm saying that there's some probability of that, not that there's a remote theoretical metaphysical possibility that it would snow tomorrow. And that's—there's nothing particularly ambiguous about saying that in order to be an accidental product contamination, the product here has to result in or may likely result in physical symptoms of bodily injury, not just that there's a theoretical possibility. But I would argue that even if you apply the district court standard of just some reasonable possibility, the evidence presented did not support that, because if you look at then Dr. Fishman's report, and this is why I don't think there really is a disputed issue of that, Dr. Fishman actually does not ever in his report come out and say consuming the amount of NSG in these sausage breakfast sandwiches will result in an adverse reaction at any level. What about more sausage sandwiches? I mean, was there a cutoff that your position is that we are assuming a certain number that a person would eat? Because there's got to be some reason you don't have NSG in certain of these sandwiches. Well, I'm not sure why Hot Stuff chose to put NSG in some of its products than some of its— That's not part of the— That's not—that's not the issue. Well, what about the number? Well, as we say in our briefs, the scientific evidence in the FDA study says when consumed with food, you would take five grams of NSG, which would basically require someone to eat 39 of these breakfast sandwiches at one sitting, or an amount of NSG that there's any scientific evidence that would show an adverse reaction. I've asked for a five-minute rebuttal. Well, you know, if your client contrived this policy language, I think Little Lady Foods is a good example of why the—may likely provide some limit on coverage, because there was a hold on the product because it had one of seven strains. It had some kind of mysterious one of seven strains of which is dangerous, and so the USDA doesn't want to market it. And so they tested it and found that it had none, and then they sold the product and they claimed the expenses of the hold. And the court said, no, there was no danger here at all, period. I don't have to decide likely versus possible. What bothers me here is the USDA recall aspect, and I would like to know, and nobody tells me, what the purpose of a Class III recall is as viewed by USDA, because it seems to me that a reasonable insurer buying this kind of coverage for the array of situations that any food marketer faces would assume, well, at least I have coverage if the USDA makes me recall the product. And you're arguing no. In fact, you denied coverage because this coverage doesn't apply to Class III recalls, and yet we have nothing in the record supporting or substantiating that legal position. Well, the policy itself doesn't speak to recalls or coverage for recalls per se, only to class coverage for accidental product contaminations. It's intended by its express terms to cover situations where the product is dangerous or could result in harm to somebody. Not is dangerous. That's not what it says. Well, it either has resulted or may likely result in physical symptoms. If you had a record showing that the USDA recognizes that Class III recalls are just for misleading label, food labeling, which USDA cares a lot about and FDA may, that would be one thing. But a recall is a dramatic event. Well, we submitted in the record the USDA and FDA's definitions of recalls, and a Class III recall is one where the FDA has determined it will not result in any harm to anybody. It is a mislabeling event, and it will not cause harm. That's why it was a Class III. And there's a full site, and there's legislative history in the record on that? I don't know if we include the legislative history, but we quote the criteria for each of the classes. If I may, I'd like to preserve the remainder of my time. Good morning, Mr. Hager. Good morning, Your Honors. May it please the Court, Counsel. This policy served a purpose. It was intended to provide protection in the wake of an accidental product definition. But when my client, HOSTA, experienced an accidental product definition in 2011, we had unintentionally mislabeled it. Houston County did not cover it. Its stated basis of denial was divorced from the policy language, and it failed to give effect to the purpose for which this policy was issued. Well, what about Little Lady Foods? Your argument applies to that case. Little Lady Foods was a suspected contamination of a strain of listeria that was confirmed to be a strain that posed no risk for harm. And this is a non-contamination that might have misled somebody. Correct. And what in that policy language suggests coverage for that? It specifically references mislabeling, unintentional mislabeling, and the definition of accidental product. But it still has to be mislabeling that creates a risk of physical harm. Correct. It's not even just a risk. It may likely result in it. Yes. Little Lady, there was no risk of harm because it was actually on hold. Well, there was at the time that they spent the money to prove that there wasn't. The district court in that case noted that the food that was on hold by the USDA was eventually sold to the secondary market. And I think Little Lady is distinguishable because it involves a suspected contamination that was proved wrong. And the claim was made under the contamination clause. Here we have a mislabeling, an unintentional mislabeling, that was proved correct. There's no doubt that these sandwiches were mislabeled. So I think it's distinguishable. Well, there's some doubt as to what the reason for the labeling requirement is. Well, the— I mean, you know, USDA doesn't want you to spend the money for a bison burger if you're just getting cow. But that has nothing to do with human health and safety. MSG has been known and is recognized by the FDA as a food intolerance. And it specifically defines food intolerance on 268 of the record. And it specifically lists MSG as one of those. And it notes that people have different sensitivities to it, and that's why labeling, accurate labeling, is critical. I think the suggestion is that the evidence at hand, the dispositive question is whether there's a possibility that any person may experience physical symptoms, illness, or sickness from the source of MSG. My concern with your argument in the district court's reading is it makes almost anything possible. Pure water, purified water. You drink enough of it, you can die. I mean, it's—anything you use to excess can make you ill or die. So under the interpretation that I think the district court adopted in your argument, anything—it's hard to say that pure water is a contaminant. And yet, under the definition that you have here, it would be a pollutant. Well, I think the policy language was correctly included under— correctly interpreted to mean a possibility of harm under the MSG standard. And we meant that possibility of harm. We show in— Well, it says made likely. And the question, I guess, is does that mean more probability or just any remote possibility to be out there? All I'm telling you is almost any product, there is a remote possibility that someone can be harmed, which means they cover everything. And it has to be linked to the mislabeled, which is what happened here. I can think of—you could say that there was carbonated water or something like that, or forgotten that there was carbonated water or something like that on the labeling. And then under the definitions you're using, the fact that that was wrong, was mislabeled, and say, well, water is— there is the potential somebody would be harmed. We didn't like the policy. They wrote the policy and they sold it to us under the aegis that they were providing protections to us. To the extent that their language may likely result as ambiguous, and that was the second ground that provides our court's conclusion, that ambiguity is interpreted in our favor. The evidence regarding MSG, I absolutely disagree. The ambiguity is that it's two or more reasonable interpretations. What I'm challenging is your argument that what you are arguing and what the district court said is a reasonable interpretation. Correct. So tell me, why is it reasonable? Well, I think it's reasonable to interpret this as requiring a possibility of harm because of the circumstances of mislabeling. We have been able to show that the substance that was not identified, that should have been disclosed, and in this case led to a mandatory recall, could possibly pose harm to someone. And we've produced evidence in the record, and I don't think it's disputed—I disagree with counsel on that point— that MSG in low levels poses harm to certain individuals. And I think that's why— But that gets into the issue about whether it's a disputed fact or not. The district court may or may not have interpreted Houston's expert writing, but assuming it did, if there is a remote possibility, how is that a reasonable interpretation? Because the language, the inconsistency between may result and likely is resolved to mean may result. It will possibly happen. That's reasonable because we're trying to anticipate the future state of events and determine whether action taken by the insurer, the food manufacturer, should be covered based on its action under the definition. So I think it's a reasonable interpretation. You've just argued Little Lady Foods was wrong. Well, I think Little Lady Foods is a suspected contamination that was confirmed not to be true. Here we have a mislabeling that's confirmed to be true. So there's more coverage for mislabeling than for contamination? When we're talking about harm, physical harm? You know how counterintuitive that is? In Little Lady, there wasn't a recall. The USDA just put the product in full. You know, I don't understand how this case morphed into this issue about possible versus likely. I haven't read the record, but as I understand it, because this wasn't recall coverage and it was only a Class III recall. Why didn't you argue simply that was an unreasonable interpretation of the policy? We did. We said that the basis of the argument. Why did we go so far beyond that? The stated basis of the lines in the Class III recall has nothing to do with the language of the policy. I think counsel admitted that. The evidence that was adduced in Sermon on Judgment showed that these sandwiches Does reasonable expectation have no role to play in South Dakota coverage law? It does. This court in the Sheppard case Not this court. The Supreme Court of South Dakota. They have ruled as follows. They declined to apply reasonable expectations where there's not any impunity. That's as far as it goes. They haven't addressed the situation here where there is no impunity. It may likely resolve. So I think the insurance reasonable expectations are absolutely consistent with the idea that we paid $88,000 this year and you're supposed to provide coverage that you promised to provide. And they didn't do it. Instead, they relied on the Class III recall that had nothing to do with the policy language. So I think their basic position is divorced from the policy language that they drafted. And they're trying to seize on that ambiguity and leverage it to their benefit. And South Dakota law doesn't permit that. It's prohibited. If I may, I want to address the suggestion about anecdotal and unconfirmed reports. This was the anecdotal and unconfirmed report according to the Myth of the Menace article that Dr. Saxon relied on and that Houston faculty submitted to this report. The anecdotal report was actually described as the most compelling support for MSG sensitivity as a possible, albeit extremely rare, cause of urticaria. It's footnote 41. It's in the record. And what the report suggests is the exact conclusion that Dr. Saxon agreed to. Now, he hedged a little bit as to the viability of the small sample size. But these are his words. Thus, I would agree with Williams and Wolfson when they said, in contrast to the case for MSG as a cause of asthmatic bronchospasm, there does appear to be some evidence to suggest that MSG may be a rare cause of urticaria and possibly angioedema. The policy language is physical symptoms of injury, illness, disease, or death of any person. It doesn't say severe physical symptoms. It doesn't say prolonged physical symptoms. It certainly doesn't say dangerous physical symptoms. So no matter how minor or no matter how ephemeral, so long as one person, upon consuming these mislabeled sandwiches, would have some effect, that passes the threshold of coverage. And the statement by Dr. Saxon, he's quoting the Mental Medicine article, that here's some patents he submitted to the court. And I think the court's certainly within its discretion to look at evidence submitted by the other side when it confirms the possibility of harm existing in this case. So I just disagree with the characterization of this as anecdotal. Well, it confirms. Studies offer some evidence. So what obligation does the insured have to react reasonably to a product problem? Well, this was on Friday they discovered it. It had gone back through August. And on Monday and Tuesday... Forget USDA. I mean, what if they had just discovered that we put jalapeno pepper instead of black pepper in this batch of product? We're recalling it because somebody might sneeze. Are the costs of that covered? No, I don't think it would be in that circumstance. Why not? Because... If the label said black pepper. Well, if black pepper was noted by the FDA as a food intolerance, then I think that we'd have a different case. Again, food intolerance is different than an allergy, which is an immuno response. Well, what in the policy language links all this into the FDA bureaucracy? It goes to the standard of evidence that they've submitted regarding characterization of what could happen as a result of this label. The evidence who submitted? Houston Catholic. The FDA's ruling on this has nothing to do with whether there was an actual possibility of harm. So you're saying that as long as the insured can show and come up with a Dr. Fishman who would say, yes, a sneezing or a runny nose might have resulted from this, then the million dollars spent to recall is covered? If their expert agrees that a runny nose can come up with this, and that's exactly what we have here, there was undisputed fact... Sounds pretty unreasonable, doesn't it? It's a policy they wrote. All we're doing here is applying the label. So there's no obligation on the insured to behave reasonably? There is, in respect to the damage that we suffer, and we have to do a duty to mitigate lost profits and all those things. But on the threshold issue of coverage, the actions that we take are covered so long as we pass that threshold. And here we have it. I think let's look at a couple different examples of insurance companies that have used different language. If you look at Rue's Foods, they used has resulted or would result. Other examples include language to the effect, a reasonable cost to believe that consumption of the product led or would lead. They chose may like the result, and we cited our brief and provided the exact opinion of the premium brands case. I realize it's from British Columbia, but it applies the exact same language and makes the exact same conclusion as the district court here. In that case, there was meat slicers that had exposed to listeria, and it was the listeria that was the clear little form. The product that was tested tested negative for that, but the court concluded that because there's a possibility of harm, coverage existed. And I think that's exactly consistent with the reasoning here of the district court. I also think that there's a noting that the bottom line is that if they wanted to impose a different standard, they should have written a different language. The may like the result language, I think the analogy used was, well, it might snow tomorrow. Well, we would never say it might definitely snow tomorrow. Which is it? It might snow or it will definitely snow. There's an ambiguity between the adverb definitely. What would you write? I mean, I've heard this from lawyers for 20-some years now. Well, they should have written it better. So what would you write to mean that coverage requires more than the possible? You could say may undoubtedly. You could say will undoubtedly result. That's much weaker coverage than may likely. It is. For the insurance purpose. Yeah. And they marketed this policy under the language. I'm asking you what's synonym for likely for that concept. It's not near possible, but it's not as much as probable. What would you write? Will likely. I would use will likely because may and likely are inconsistent. They're not. They're not. May. Lawyers can dream up that they're inconsistent, but they're not. May, harking back to my grammar in college, may is a tense verb. It's a tense modifier. In this sense. It's an auxiliary verb. And likely is an adverb that qualifies what you're talking about. So why is it that may is just providing the tense for the sentence and likely is really the controlling verb, the controlling word here? Because may controls the mood of the sentence, and it states the certainty of the speakers as to what will happen in the future. If it said will likely, then likely controls. But may likely or might likely, it's inconsistent. It's grammatically inconsistent. And your authority for that? The rules of grammar. And I think it's also may result. Well, which century's grammarians? We decided the numerous authorities interpreting may as possibly, and so did this report. I see my time's up, and that's where I was going to finish. It's set forth in our brief the repeated examples under which this language is construed to mean both possibly and also in the Kramer-Brands case. It's absolutely not appropriate. Thank you. Thank you, Mr. Hayden. Mr. McGinnis, do you want to start? One minute and 50 seconds. Thank you, Your Honor. I just want to make two points. What I heard Hotstock's attorney claim is that Houston casualties, reading here, is divorced from the actual language of the policy, which is not at all the case. The policy needs to be enforced as written. The insuring agreement and whether or not the insuring agreement has been met is the burden that the insured, Hotstock, faces to prove. And part of that burden is to prove it. I didn't see anybody argue with the definition of a contaminant. It talks about mislabeling, which is a raw term, but then it goes into referring to the contaminant, which we all agree is so forth. Does the policy define a contaminant? It does, and mislabeling does fall within the definition of contamination.  Mislabeling does fall within the definition of contamination, so that's not at all true. So a mislabeled product that has all very healthy product contains nothing but healthy things, is a contaminant if it's mislabeled? It would be contaminated, but it wouldn't be an accidental product contamination because it wouldn't satisfy the second problem, which would be that it would be harmful. And that's exactly what was going on in the Little Lady Foods case. In Little Lady Foods, the product was, in fact, contaminated. It was contaminated with a form of listeria that was discovered in the product. And the insured argued, we can't possibly sell this because it's got listeria in it. Nobody's going to want to buy a burrito that's got listeria in it. But it turned out that listeria was not a dangerous form of listeria. It was a benign form that would not cause anyone to become sick. So although it met the first problem of the definition of contamination, it didn't meet the second problem because the form of listeria would not cause illness, and therefore the court said there's no coverage. This is not a policy that covers recalls. It's a policy that covers accidental product contamination, which requires risk of illness. And I would urge the court to review the Myth or Menace article and the other materials cited by Dr. Saxon and Dr. Fishman because, in fact, they do not support the proposition that when consumed with food, MSG at the levels involved here would cause illness in anybody. Thank you very much.